STATE OF MAINE
PENOBSCOT, SS

SUPERIOR COURT
CIVIL ACTION
CV-2002-144
JLH - PC 1/20 04

FILED & ENTERED
SUPERIOR COURT

JAN 30 2004

PENOBSCOT COUNTY

DAVID ASTBURY,
       PLAINTIFF

Vs.

ORDER TO CORRECT CLERICAL ERROR

SHARON DREW,
       DEFENDANT

DONALD L CARPENT
LAW LIBRARY

APR 14 2004

The Court on its own motion, under Rule 60(a) M.R.Civ.P., directs the Clerk to correct a clerical error in the above captioned matter to amend the docket number on the Decision and Judgment dated 1/29/04 and to correct the first name of the Defendant in the caption.

It is hereby Ordered, the docket number on the Decision and Judgment dated 1/29/04 is amended to reflect CV-2002-144 and the first name of the Defendant to Sharon.

_____11/30/04_____
Dated

_____
Jeffrey L. Hjelm
Superior Court Justice

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-02-441

```
FILED & ENTERED
SUPERIOR COURT

JAN 3 0 2004

PENOBSCOT COUNTY
```

David Astbury et al.,
        Plaintiffs

v.                                              Decision and Judgment

Sheila Drew,
        Defendant

Hearing in this matter was held on July 9 and 10, 2003. On both trial dates, the adult plaintiffs and the defendant were present with counsel. The minor defendants, who are the children of plaintiff Nancy Astbury, were present when they testified as witnesses. Following the in-court trial dates, the parties took the testimony of several other witnesses and otherwise finalized the form of several trial exhibits. That material was filed pursuant to an initial and amended stipulation regarding the admission of various transcripts and documents. The parties also filed written argument. The court has considered those submissions along with the evidence presented in the courtroom.

This case arises out of an automobile collision that occurred on February 20, 2001, in Sapling Township near Rockwood. The plaintiffs' unified liability claim is easily addressed and adjudicated. Indeed, the defendant does not submit a substantive argument in opposition to the plaintiffs' proof on this issue. Plaintiff David Astbury was driving the family vehicle on route 15. His wife, plaintiff Nancy Astbury, was seated in the front passenger seat. Her children (and David's stepdaughters), Hannah Taylor and Sarah Taylor, were in the rear seat on the driver and passenger sides respectively.[1] The

---

[1] At times in this opinion, the court will occasionally refer to members of the Astbury family by their first names. This is not a sign of disrespect but rather is done for ease of reference.

1

weather was clear, dry and non-contributory. As David drove within the 55 mile per hour speed limit on a straight stretch of road, the defendant pulled out of her driveway, which enters onto route 15. There was a snowbank at the mouth of the defendant's driveway, which required her and others using her driveway to exercise particular caution. Despite the presence of that snowbank, a person exiting the defendant's driveway could do so safely by proceeding slowly and exercising vigilance. The defendant had used the driveway many times under similar circumstances and, in any event, was completely aware that the snowbank was there and that it required more care than at other times of the year. Nonetheless, although the Astbury vehicle was fully visible approaching the defendant's driveway on route 15, the defendant pulled out of her driveway and directly into the path of the Astbury car. This made a collision unavoidable. The defendant saw the Astbury vehicle when she was well into its lane, and she then accelerated in a vain attempt to prevent the collision. At the same time, David swerved sharply to his left but did not have time to apply the brakes.

In the resulting impact, the Astbury vehicle (an SUV) sustained significant damage to the front passenger side and lesser damage toward the back on the passenger side. The defendant's vehicle, a passenger car, was hit on the front driver's side fender area. *See, e.g.,* plaintiffs' exhibits 42-19, 42-29, 42-30, 42-31 (photographs). The collision, probably in combination with David's attempt to avoid it, caused the Astbury vehicle to travel across the oncoming land and then off of the road itself. The vehicle narrowly missed a large tree and several snowmobilers who happened to be in the area on a snowmobile trail that runs parallel to the road.

From this evidence, the court concludes that the defendant was wholly at fault for the accident. She chose to enter the public way from her driveway without properly observing and taking account of oncoming traffic. Though her vision of the road was obstructed by the pile of snow at the end of her driveway, she was aware of that obstruction and the danger it created. She had the option of proceeding more cautiously but failed to do so.

2

The defendant has not proven that David Astbury was contributorily negligent.[2] The evidence suggested that he did not see the defendant's vehicle until it was partway into his lane of travel. However, the defendant does not argue that even if he had seen her earlier, and even if this constituted momentary inattention to traffic conditions, that circumstance was a legal cause of any of the plaintiffs' injuries or losses. The evidence would not support such an argument even if the defendant pursued it. Because the defendant's conduct made the accident unavoidable, and because David was driving 55 miles per hour, it would be speculative to suggest that the impact would have been materially mitigated if David had swerved a moment earlier. Thus, the defendant does not argue comparative negligence, and no such defense is apparent from this record.

For these reasons, the court concludes that the defendant was negligent. The plaintiffs' separate damages claims must next be considered.

### Nancy Astbury

Because of Nancy's position in the car, the point of impact between the two vehicles was closest to her. She was struck in the chest,[3] and that blow caused considerable difficulty for her to breathe. After she was able to get out of the car, she was unable to attend to the needs of her family members because she was in pain. Nancy was the first to be taken to the hospital. There, she was examined, given x-rays and then released.

The best evidence about the nature and extent of Nancy's physical injuries is found in the testimony of her treating physician, Dr. Ross. Beyond the treatment that he provided to Nancy, Dr. Ross supervises a physician's assistant, who also provided care for her. Thus, Dr. Ross' assessment of Nancy's injuries is based on his direct contact with her and on the treatment provided by the PA. Dr. Ross is also the Astbury family physician.

---

[2] The comparative negligent defense, of course, would not arise from or relate to any conduct of the three passenger-plaintiffs.

[3] A medical record prepared by one of Nancy's treaters suggests that David's head struck her on her chest at impact. Whether the blow occurred in this way or in some other manner (such as the force of the seat belt) is neither material nor surprising, in light of the magnitude of the collision and the resulting confusion.

3

As a result of the collision, Nancy developed costochondritis, which is an inflammation of the sternum. She also sustained a strain of the cervical and thoracic spine. The costochondritis is the most significant of Nancy's physiological injuries. Initially, this injury generated significant pain upon deep breathing, coughing and physical activity. She was instructed to engage in certain exercises in order to help with the healing and to avoid complications such as pneumonia. Additionally, Nancy was prescribed anti-inflammatories and pain medication. Due to her injuries, including the contused sternum, she missed several days of work during the week following the accident. (Nancy is employed as a teacher, and the accident apparently occurred during the February school vacation.) Nancy's subsequent course of treatment demonstrates that, even within a relatively short period of time subsequent to the accident, the pain caused by the condition diminished. Indeed, within a week of the collision, Nancy reported considerable improvement in her chest, and by the middle of 2001, when she had contact with her treaters, she made no mention of any problem.

However, despite the fact that costochondritis often permanently resolves, Nancy intermittently has experienced the same kind of pain associated with the condition. During several visits to her treaters in 2003, for example, she reported incidents when she experienced pain, usually when she sometimes engages in activities, such as moving heavy objects, that may put strain on her chest. The court accepts Dr. Ross' ultimate opinion that these incidents of pain, although separated by periods of time when Nancy is asymptomatic, have their genesis in the collision at issue here. These incidents may be, as Dr. Ross agreed, "new episodes" of costochondritis. However, these episodes constitute the manifestation of a chronic condition that was caused by the February 2001 accident. Under this analysis, the triggering events are not intervening causes that are legally sufficient to break the causal link between the underlying condition and the accident, because the condition resulted from the accident. Rather, the events that create the pain are an aggravation that cannot be fairly apportioned. *See Lovely v. Allstate Ins. Co.*, 658 A.2d 1091, 1092 (Me. 1995).

Nonetheless, the episodes of pain are infrequent. Dr. Ross has not restricted Nancy's activities, she does not have regularly scheduled examinations to allow her treaters to follow her condition, and she does not regularly take medications for the

4

condition. Rather, she takes a prescription drug for pain only as needed, and she consults with her treaters as needed. The incidence of those examinations has been sporadic. Nancy testified that her condition has some ongoing effect on her because she is less active than prior to the accident. The history of her medical treatment supports this suggestion, but the minimal nature of that treatment – and the absence of any ongoing treatment or rehabilitative services – demonstrates that the condition, while real, is not a substantial impediment in her life. Further, as Dr. Ross noted, the problem may dissipate over time. This prognosis is important in light of his general observation that costochondritis often becomes permanently asymptomatic. Thus, the extent of future pain and suffering, and the future need for treatment have not been proven to be significant.

The injuries to Nancy's neck and upper back gradually healed over the first several months following the accident. The associated pain increased in the short term, but by July, the pain had largely dissipated, and by September, it was gone. In the accident, Nancy's hip was bruised. This injury healed normally.

In addition to the physiological injuries, the collision clearly had an emotional effect on Nancy. Immediately following the accident, she suffered emotional trauma due to her individual circumstances and also because of the fact that her husband and daughters were involved as well. As time went on, she had some difficulty sleeping and suffered from nightmares. She was anxious while driving. The effects of the accident caused stress within the family, and she did not escape those effects. Ultimately, the PA who treated her formed a diagnosis of post-traumatic stress disorder. For a period of approximately three months in late 2001 and early 2002, she participated in counseling. Her counselor, Vauna Haza, agreed with the PTSD diagnosis, characterizing it as "mild."

However, just as it is clear that the accident inevitably took an emotional toll on Nancy, other factors in her life that were unrelated to this collision contributed significantly to her condition. For example, Nancy's relationship with her former husband (the father of Sarah and Hannah) was sometimes a difficult one. Also, during the time when Nancy was in counseling, several relatives were living in the Astbury home, and this appears to have created considerable stress. Further, for the reasons set out below, the plaintiffs have not proven the economic loss they claim in this case.

5

Nancy testified that a significant component of her anxiety and the stress within the family was due to economic pressure occasioned by David's inability to work. The foundation for this claim has not been borne out. At least as significant as these factors is evidence that at least within several years prior to the collision of February 2001, Nancy had been diagnosed with depression and was treating with a counselor for that depression. As part of her post-accident treatment with Dr. Ross' office, Nancy was prescribed an anti-depressant. It is surprising that at trial, Nancy testified that she was unable to remember the counselor's name or the dates of that earlier treatment. Nancy also stated at her deposition that subsequent to the accident, there were no significant sources of stress or anxiety aside from the accident itself. The testimony and records of Ms. Haza do not support this assessment.

From this, the court concludes that a significant component of Nancy's emotional trauma is not attributable to the defendant's negligence. Some of that distress clearly flows from the accident, and the expenses for the counseling sessions with Haza can fairly be assigned to the defendant because a sufficient motivation for that counseling can be found in the accident itself.

Although the accident contributed to a difficult emotional period for Nancy, within approximately one year after the collision, she had improved considerably. Her nightmares were infrequent, and her anxiety while driving was also not constant. *See generally* plaintiff's exhibit 26a.

Although, for the reasons noted below, the court concludes that the plaintiffs have not proven their claim for lost income, thus undermining this basis for Nancy's claim that the accident resulted in financial difficulty that created stress in the marriage, the court finds that inevitably the consequences of the accident affected Nancy's relationship with David. Their physical injuries and the emotional trauma of the accident itself can only have disrupted their marriage.

The court accepts Nancy's claim for medical expenses of $3,585.[4] Additionally, she did not work for a total of 10 days. *See* plaintiff's exhibit 41. (This does not include 3 days of work, which she includes as a basis for relief, that she missed because of

---

[4] Although it is included in her schedule of medical bills, Nancy is not seeking reimbursement for the July 1, 2002, expense of $129. *See* plaintiffs' exhibit 35.

6

depositions scheduled in this case.) Calculated on a daily basis, she earns $288, and her lost wages are therefore $2,880. Nancy's special damages are therefore $6,595.

Based on this evidence, the court awards Nancy Astbury compensatory damages in the amount of $25,000.

### Sarah Taylor

The impact of the collision caused the rear of Sarah's seat to collapse, presumably from the weight of objects in the back of the vehicle and from the physical forces of the impact. As a result, Sarah was bent forward and, for some difficult moments, was trapped in the car because she could not release her seat belt. Sarah has a particular fear of being confined in ways such as this, and so this circumstance compounded the anxiety of the event. Sarah was able to see her mother, who was seated immediately in front, open her own door and fall to the ground. When Sarah was able to get out of the car, she saw that her mother had great difficulty breathing. This is another factor that heightened the emotional impact of the collision for Sarah.

The force of the impact caused a heavy bag of deer feed to hit Sarah in the back of her head.[5] She also had some minor cuts on her hand caused by broken glass. She was transported to a local hospital by ambulance. There, as is noted in the emergency room record, she reported pain in her "left flank" but denied any other injuries. She was not admitted to the hospital but rather was discharged "in good condition." Over the course of the week following the accident, the left side of Sarah's abdominal area was sore, but that soreness subsided. She was examined by her pediatrician, Dr. Pelletier, on February 28. Nancy Astbury accompanied Sarah for that office visit. Dr. Pelletier reported that Sarah had been sore in her "left trunk" but that this condition had improved. Dr. Pelletier made no findings of injury and made a diagnosis of an improving contusion to Sarah's chest wall. She later reported to plaintiffs' counsel that on February 28 she found "no evidence of any pain." *See* plaintiffs' exhibit 36 (October 30, 2001, letter).

---

[5] Through their trial testimony and the records associated with treatment provided to them (*see, e.g.,* plaintiffs' exhibit 36 (Dr. Pelletier's letter dated October 30, 2001, to Attorney Willey regarding Sarah); plaintiffs' exhibit 38 (Dr. Pelletier's letter dated October 30, 2001, to Attorney Willey regarding Hannah)), Sarah and Hannah both report that they were each were struck in the back of the head by a bag of deer feed as a result of the impact.

Sarah claims that the defendant is liable for two particular physiological conditions: an injury to her left shoulder, and abdominal pain. The court concludes, however, that she has not proven that either of these conditions was caused by the February 2001 collision.

The first reliable reference to a shoulder injury following the collision arises from Sarah's examination by Dr. Pelletier on March 13, 2001 – more than three weeks after the accident. Despite Sarah's arguments to the contrary, the medical evidence regarding her condition more proximate to the accident cannot be stretched to indicate a left shoulder injury. For example, despite Dr. Pelletier's abstract construction of the meaning of "trunk," as that word appears in the February 20 emergency room report, that reference is simply too vague to support Sarah's specific claim that it memorializes a shoulder injury. This is particularly true in light of the denials of "any other injuries," set out in that report. It is further corroborated by the fact that when Dr. Pelletier first saw Sarah following the accident, neither Sarah nor her mother reported any shoulder pain or symptoms to the doctor.

Then, on March 13, in an unscheduled visit, Sarah sought medical treatment from Dr. Pelletier specifically for acute shoulder pain. There, Sarah was seen by a nurse practitioner. The history provided to her, which originated either with Sarah or Sarah's grandmother, revealed that the pain occurred the morning of that visit when Sarah was putting on a coat. As a result of this assessment, Sarah was referred to a pediatric orthopaedist, Dr. Greene, who saw her later that day. As part of Dr. Greene's examination, Sarah (or someone on her behalf) told him that the pain had been ongoing for several days prior to March 13 and that it was similar to an episode that had occurred at least six months earlier. This apparently referred to an incident when Sarah had hurt her arm and was examined by a Dr. Roberts roughly six months prior to March 2001. *See* plaintiffs' exhibit 29 at p. 11. (At that earlier examination, Dr. Roberts treated Sarah for an injury that had occurred roughly three years prior to the examination date; the pain was recurring, and the possible diagnosis, based on history and subjective complaints, was some "mild instability" of the left shoulder.) The history provided to Dr. Greene in March 2001 did not make reference to the February 2001 motor vehicle collision. The lone physical finding revealed by Greene's examination was a limited range of motion in

the shoulder, most likely caused by "laxity" or "multidirectional instability" in the joint. However, Greene found no evidence that this underlying problem originated with trauma, and the condition generally does not necessarily arise from trauma. Although certain movements, such as lifting a heavy object in an extreme position, can aggravate a pre-existing condition similar to Sarah's, there is no meaningful evidence that these circumstances occurred here. It also bears note that Dr. Greene saw Sarah again in December 2002 for recurring problems with her left shoulder, and again Dr. Greene found no evidence of a traumatic origin. Further, the history that Sarah gave to him then did not suggest a traumatic origin but rather a gradual development of the problem.

Thus, through Dr. Greene's affirmative testimony, and Dr. Pelletier's testimony that she could not draw a causal link between the accident and an aggravation of Sarah's shoulder complaints (rather, deferring on that issue to Greene), the record is absent of meaningful proof that the defendant's negligence was a legal cause of this injury or that it aggravated her pre-existing condition.

Next, Sarah's allegation that her stomach and abdominal pain was caused by the accident are vitiated by the absence of any meaningful evidence connecting the two. Although it appears that this condition post-dated the accident and that, according to Dr. Pelletier, a causal link is not impossible, Dr. Pelletier noted that abdominal problems are "complicated," and she declined to assign the medical condition as a consequence of the collision. Thus, the court concludes that on this record any such link is too speculative to form the basis for relief.

Therefore, for physical injuries that can be tied to the accident, the court is left with several minor problems that healed quickly. Her compensable medical bills total $740, based on the expenses incurred on the date of the accident and the February 28 examination by Dr. Pelletier.

Not surprisingly, the collision had an emotional impact on Sarah. In part, this flows from her immediate fears about the fate of her mother. On a more lingering basis, she has been unusually apprehensive of the dangers of driving.

Based on this evidence, the court concludes that Sarah is entitled to compensatory damages of $7,500.

9

## Hannah Taylor

Hannah's immediate circumstances at and after the impact were similar to Sarah's. The collision caused the rear of the seat to collapse, bending Hannah forward. Items of property in the rear of the vehicle were propelled forward, and Hannah was struck in the back of her neck by a bag of deer food and by a plastic sled. Her right foot was jammed under the driver's seat. As with Sarah, Hannah was instantly afraid for her mother's fate because of her (Nancy's) proximity to the point of the collision. Hannah also heard Sarah scream while she was trapped in the car.

Hannah was able to get out of her family's vehicle without assistance. She was able to see that her mother was on the ground but that others were tending to her. After being placed on a long board, Hannah then was taken to the local hospital by ambulance. There, she reported pain in her lower back and right foot, although there were no objective physical findings. The attending treaters diagnosed her with a low back strain and a contusion of her foot. Hannah was discharged "in good condition." She was advised to take Tylenol, apply ice to the injured areas, and contact her own physician if needed.

Although Hannah's foot injury healed steadily and relatively promptly over time, she had continuing problems with her back. Also, soon after the accident, she developed neck pain attributable to the collision. Hannah missed some time from school because she was lame. Eight days after the accident, Hannah was examined by Dr. Pelletier, who was also treating Sarah. At that first post-collision office visit, Hannah was experiencing pain but not acute distress, and she had full range of motion. X-rays of the injured areas (including both the thoracic and cervical spine) were negative. Dr. Pelletier prescribed continuing rest for two weeks and Tylenol. Sarah saw Dr. Pelletier again on March 16. Her foot was not problematic, but she reported ongoing pain in her neck and lower back. Dr. Pelletier referred Hannah for an evaluation by Dr. LaBotz, who appears to be an orthopaedist and examined Hannah in late March. Dr. LaBotz found that Hannah was improving although she had curtailed the extent of her physical activity subsequent to the collision. Nonetheless, Dr. LaBotz concluded that Hannah had made "good improvement" and recommended her for physical therapy.

10

At the beginning of May, Hannah began a month-long course of PT with reports of pain and with some limitations in her range of motion. After one month of therapy, she was discharged. At that time, her normal daily activities did not generate pain, and she was able to perform some lifting without pain. At a follow-up examination late in May, Hannah's physical therapist found that her improvement was continuing and that she was involved in more vigorous physical activity without pain. The physical therapist removed all restrictions on her activity and cleared her to return to gymnastics, although recommending that she ease back into that program and that she continue with home exercises.

From this, it is clear that the injury to Hannah's back required her to curtail her activities. At trial, Hannah testified that she withdrew from cheerleading because of her injuries. However, his is not accurate because the cheerleading season had been completed prior to the collision. Thus, the court cannot rely heavily on Hannah's memory of the actual effects of her injury on her activities. The better evidence flows from such sources as the documented medical treatment. After Hannah completed physical therapy, she next saw Dr. Pelletier in mid-June 2001. Hannah did not raise any issue regarding her neck or back. Rather, that appointment related to abdominal discomfort (a condition that cannot fairly be tied to the collision at issue here) and significant emotional stress caused by internal family issues that also are unrelated to this case. Then, in mid-July, Dr. Pelletier again saw Hannah, and Hannah reported that her neck and back were "fine." She was participating in athletics without difficulty. Hannah's mother, who was present for the examination, mentioned an incident of pain, but Hannah downplayed it and described it as "normal." Hannah's physical condition was normal. Dr. Pelletier concluded that Hannah had "no residual evidence of back/neck injury."

Despite a series of examinations by Dr. Pelletier, Hannah made no complaints or reports of pain or neck and back problems until late February 2002, when she sought medical attention for a possible viral infection. She was found to have a backache, but Dr. Pelletier was unable to connect it to the collision, even with the assumption that these problems did not predate the accident. Against this assessment, the court also declines to attribute Hannah's back problem at that time to the collision. This uncertainty is

11

particularly predicated on the fact that Hannah engages in strenuous athletic conduct that places stress on her back. (Indeed, Dr. Pelletier characterizes Hannah's athletic pursuits as "high risk.") On this record, Hannah has not proven that those activities, in combination with the injuries that can be attributed to the collision, constitute a single injury triggering the defendant's apportionment under *Lovely*.

The same conclusion flows from an examination of the limited instances of medical treatment subsequently provided for Hannah's back. As with the issues underlying the February 2002 condition, Dr. Pelletier was specifically examined about her opinion regarding the existence of a causative link between the accident and the back pain that Hannah sometimes reported in 2002 and later. Dr. Pelletier responded that it is difficult to assign a single event or incident as the cause of back pain, particularly when the patient vigorously pursues activities that put strain on the lower back. *See, e.g.* plaintiffs' exhibit 56 at p. 101. The best evidence supporting Hannah's causation argument is temporal: she did not have back problems prior the accident; she had a back condition following the accident; therefore, at least in part, the problem was caused by the collision. This argument is persuasive for the period of time proximate to the accident when, in this case, Hanna's condition was persistent but improving. However, that argument loses force for that period of time more remote from the event for at least three reasons in combination: first, the onset of pain became more sporadic, thus losing the continuity that characterizes the earlier condition; second, Hannah became reintegrated into the athletic community, thus providing other sources of a new back condition; and third, Hannah's physician was not satisfied that the temporal argument urged here is medically valid.[6]

---

[6] Hannah cites to several relatively recent medical reports as evidence of causation. For example, in April 2003, Hannah was examined by Dr. Lever. The note from that office visit indicates that it was a follow up from the car accident. The note goes on to record complaints of back and neck pain. Evidence of this sort, which is limited to the note and Dr. Pelletier's construction of it, is insufficient to establish a causal connection between the accident and the medical issues addressed at that visit. First, the text of the note itself does not indicate whether, in the doctor's opinion, such a link exists, particularly in light of the notation of "back risk activities" such as cheering, gymnastics and track and field events. Second, any evidence flowing from these notes still must be considered in light of Dr. Pelletier's testimony, which the court considers to be more probative because of the mere fact that she was examined by counsel and her thoughts on Hannah's situation

12

Thus, for these reasons, the court concludes that Hannah in fact sustained physical injuries in the accident. Further, of those injuries, the injuries to her thoracic and cervical spine endured the longest. However, within four or five months of the accident, those problems were asymptomatic.

With this parameter to an understanding of Hannah's physical injuries, her medical expenses are correctly set out in plaintiff's exhibit 39. Those expenses amount to $3,744.

In addition to her physical injuries, Hannah understandably and foreseeably experienced emotional distress. As with Sarah, this resulted from her own injuries as well as from her perceptions and apprehensions at the scene of the accident regarding its impact on members of her family. She still harbors memories of the accident and, in some situations, is quite anxious while driving in a car.

Hannah also has other sources of considerable stress in her life because of difficult dynamics within the family, which are unrelated to and predate the accident. It is significant in this context that during the time Hannah was recovering from the back injury that she has proven was caused by the injury, her mother spent considerable effort with Dr. Pelletier and members of her staff addressing the need for counseling. That counseling, however, was for family issues. The record contains no meaningful suggestion that this approach was significantly motivated by the emotional effects of the accident. Thus, Hannah was (and remains) troubled by the accident. However, much of the stress in her life is unrelated to the basis for her claim here.

On these considerations, the court awards Hannah Taylor compensatory damages of $12,500.

### David Astbury

As a direct result of the vehicular collision, David's head hit the windshield, leaving a star-like pattern of crack in the glass. This resulted in a small permanent scar on his forehead. He did not lose consciousness. Additionally, his foot was caught up under one of the pedals. David was able to hear Nancy say that she could not breathe.

---

could be explored more fully than the written memorialization of an office visit. As is noted in the text, Dr. Pelletier declined to draw the essential causal relationship between the collision and Hannah's ongoing back problems. Thus, when the evidence is viewed in its entirety, it is inadequate to sustain Hannah's burden on this point.

After Nancy was able to open her door and fell onto the ground, David was able to get out of the car on his own, went over to her and tried to comfort her until help arrived. David also tried to provide reassurance to Nancy's daughters. Despite the help he was able to provide, he was, as Hannah described his appearance, in a daze.

Within a short time after the collision, David began to experience back pain. He also had pain in his head and with his left hand. He hurt his hand because he had held the steering wheel tightly at impact and as he attempted to control the vehicle after the collision. In fact, his effort caused him to bend the steering wheel. David was transported to the local hospital by ambulance. During that process, his left foot was becoming swollen, and the responders removed his left boot to accommodate that problem. At the hospital, he complained about head, left hand and left foot pain. A physical examination revealed a minor abrasion on his forehead and tenderness in his hand and foot. He was diagnosed with contusions of the forehead and left hand, and he was released from the emergency room without being admitted to the hospital.

While he was at home during the night of the accident, David fainted after he got out of bed to get pain medications for Nancy. The next day (the day after the collision), he was examined by the physician's assistant who works with his primary care physician, Dr. Ross. As part of that examination, David reported pain in his back, left hand and left foot. The PA diagnosed a concussion, hand sprain and possible fracture in the foot. X-rays, however, did not reveal such a fracture. When the PA saw David again on February 26, his headache and hand pain had diminished. However, David continued to have problems with his back and foot. The injury to David's hand and the pain in his neck subsided unremarkably over time.

Aside from the treatment he received at the emergency room on the day of the collision, David's first contact with a physician following the event was on April 16, 2001. The focus of that examination with Dr. Ross was his left foot. David was having considerable pain and swelling in the fifth (small) toe of his left foot. Dr. Ross referred David to a local podiatrist (Dr. Brewer), who examined him in late August. Included among Dr. Brewer's diagnoses were synovitis, or inflammation, of the toe. After a course of physical therapy, Dr. Brewer saw David again in early November. Dr. Brewer

noted that the therapeutic efforts she coordinated after the August examination, including injected medications and the PT, were not fruitful.

Dr. Ross then referred David to Dr. Pomeroy, an orthopaedic surgeon specializing in feet and ankles.[7] Dr. Pomeroy examined David in February and June 2002 and ultimately performed surgery on David's injured left foot in February 2003. Although there was a minor change in the formal diagnosis, Dr. Pomeroy concluded that David had synovitis of the fifth left toe and hammertoe affecting the same toe. Hammertoe is the end result of a process, sometimes originating in trauma, where ligaments in the toe are damaged, thereby leading to increased motion of the affected joint (turf toe). This increased motion creates an inflammation (synovitis), which then distorts the position of the toe (hammer toe). When the increased motion relates to only one joint – as it did with David --, then trauma can be the only cause. Otherwise, if all toe joints have the same condition, then there may be other explanations.

The defendant contests David's allegation that the collision was the legal cause of a serious toe injury. In the end, the court concludes that although the defendant's position has some support in the record, the preponderance of the evidence supports David's causation case. An examination of his claim based on the foot injury starts with the absence of any condition prior to the collision at issue here. Then, it is clear from the initial medical reports and treatment that David sustained an injury to the outside of his left foot in the accident. For example, the ambulance personnel needed to remove his left boot because his foot was swelling, and he reported pain when examined at the hospital. The next day, David told his physician's assistant of the foot injury. From these, it appears that the condition of David's foot deteriorated. Two months after the accident, David saw Dr. Ross primarily because of this problem. This was followed by the involvement of a podiatrist (who administered cortisone injections, which provided only temporary relief), physical therapy, an orthopaedic referral, and ultimately surgery.

Dr. Pomeroy's testimony largely rules out causes other than trauma. The defendant then argues that some other mechanism – such as a work-related accident

---

[7] Dr. Pomeroy's testimony was presented in transcript form. Portions of the transcript are highlighted. The court has read the entire transcript and has not given the highlighted material emphasis because of those markings.

15

arising out of David's contracting business – is responsible for the substantial nature of this injury. As is noted above, this argument has some basis in the evidence. For example, Dr. Pomeroy took x-rays of the affected toe and found evidence of a possible "old disunited fracture" of a bone in that toe. Because x-rays taken two days after the accident did not reveal a fracture, the defendant argues that David must have broken the bone as reflected in Dr. Pomeroy's x-ray, sometime after the February 22, 2001, x-ray was taken. However, Dr. Pomeroy made it clear that despite the terminology associated with his x-ray results, he had not concluded that David in fact had broken his toe bone. *See, e.g.*, plaintiffs' exhibit 25 (Dr. Pomeroy deposition transcript) at pp. 10, 11. Further, David's synovitis may not have had its genesis in the incident when his bone was broken (if, indeed, that happened at all). Thus, the inferential basis for the defendant's argument is insufficient to support her conclusion of subsequent trauma.

The court places weight on Dr. Pomeroy's opinion that David's foot injury arose from the February 2001 collision. He had a meaningful familiarity with those circumstances and of David's relevant history, although his understanding of the latter was not exhaustive. Further, the court accepts Dr. Pomeroy's explanation for the absence of significant findings in the February 20 emergency room record and in an MRI study conducted subsequently. Dr. Pomeroy was not examined on the February 22 x-ray that did not indicate a fracture. The court declines to speculate on whether this information would have changed Dr. Pomeroy's opinion. The resulting question is whether that evidence is sufficient to defeat David's proof to the contrary, and for the reasons noted above, the court concludes that it is not.

Second, even if the record compels a finding of post-accident trauma as the defendant argues, then the result would have been a single injury that the defendant has failed to apportion under *Lovely*.

The defendant also calls into question the mechanism of the injury, which is based on David's report that his left foot was stuck under the brake pedal and was injured because of the post-collision movement of the vehicles. The court does not find this account to be necessarily unreliable. More importantly, because of the magnitude of the collision and the confusion that the participants must have felt in those circumstances, the parties' account of how they sustained specific injuries understandably may carry some

16

inaccuracies (just as the court did not give weight to those types of challenges to Nancy's account of the mechanism of her chest injury). Thus, even if one should be skeptical of David's testimony on this point and the similar report he gave to his treaters, the court does not find that particular point to be important in the circumstances of this case.

Therefore, while the causation question is clearly worthy of analysis, the best construction of that evidence leads to the likely conclusion that the entire injury to David's left fifth toe is attributable to the accident. This injury has functionally resolved and no longer is a problem of any consequence for David. However, until the injury healed, it was painful and affected his activities.

The other major component of David's physical injury claim relates to the back injury. This issue is complicated because of a very significant back condition that predated the injury. Dr. Doolittle, a neurosurgeon, treated David for the back condition prior to the accident, and he also treated David for the effects of the accident on David's back. Dr. Doolittle's testimony on this issue is therefore the centerpiece of the evidence regarding this aspect of David's claim. Unfortunately, even after several careful readings of the transcribed testimony of Dr. Doolittle, it remains confusing.

Dr. Doolittle's treatment of David originated in 1997, following a referral from Dr. Ross because of ongoing back and radicular pain. Dr. Doolittle diagnosed lumbar disk disease (rupture) and performed lumbar cage fusion surgery in May 1998. By October 1998, David's pain had diminished substantially, and he had already returned to work. In May 1999, when David was examined for a one year follow up, he did not have significant pain, and Dr. Doolittle concluded that the prior year's surgery had had its intended anatomical effect. Dr. Doolittle's next contacts with David occurred in July 2000, which was the scheduled two year follow up, and then in September 2000. At those times, David had new back complaints that Dr. Doolittle concluded were different from and not related to the condition that prompted the 1998 surgery. The new condition was limited to David's musculature, was not spinal in origin and consisted of muscle strain caused by physical activity. The pain was located in David's paraspinal muscles in the low back on the right side. A course of massage therapy was productive. By November 2000, Dr. Doolittle wrote that David's back and radiating leg pain had dissipated. However, Dr. Doolittle also was willing to prescribe the purchase of a hot tub

17

for ongoing therapy and pain relief. To support the availability of insurance for the purchase of the spa, in December 2000 – just two month prior to the collision --, Dr. Doolittle wrote the carrier that it was medically justified because David "often has low back fatigue, tiredness and spasm" in the lumbar area. This assessment has significance in this case because of its confluence with the back injury that David sustained in the accident, but even beyond that, as Dr. Doolittle acknowledged, the recommendation of a hot tub is based on an expectation that David's lower back problem would extend into the future.

David then saw Dr. Doolittle on March 1, 2001, roughly one week after the accident. Dr. Doolittle ultimately ruled out any injury to David's spine or, more specifically, to his disks. *See* plaintiffs' exhibit 24 (Doolittle deposition) at p. 49. Rather, the injury sustained in the collision was to David's soft tissues. *Id.* Thus, the accident did not aggravate the condition that led to the 1998 surgery. Rather, Dr. Doolittle found tenderness in David's cervical spine and the paraspinal muscles on the right side. *Id.* at pp. 37, 62, 66. The former constitutes the neck injury that healed promptly. The central question concerns the relationship between the latter injury and David's condition at the end of 2000 (that is, just prior to the accident). Dr. Doolittle's opinion on this issue evolved over the course of his testimony. Ultimately, the court finds that based on the best reading of his testimony, Dr. Doolittle's findings reveal that the lower back injury that David sustained in the accident aggravated his pre-accident condition – in other words, that there is one injury. Prior to the accident, David was having trouble with his paraspinal muscles, which were in spasm. *Id.* at pp. 26, 27. These also were the muscles affected by the accident. *Id.* at p. 62. Further, the symptoms were qualitatively similar: spasm, or tightness. *Id.* and at p. 68. Dr. Doolittle ultimately rejected the suggestion that David was essentially asymptomatic at the end of 2000, because, despite the glowing report dated November 13, 2000, *see* plaintiffs' exhibit 24a, Dr. Doolittle also represented to David's health insurance carrier that he (David) still suffered regularly from low back pain and needed the hot tub for medical reasons. *See* plaintiffs' exhibit 24 at p. 73. Thus, because David had a pre-existing, symptomatic back condition at the time of the accident, and because he sustained injury to the same part of his anatomy as a result of the collision, the *Lovely* apportionment question arises.

18

Addressing the apportionment issue, the parties closely examined Dr. Doolittle on the progression of David's back condition subsequent to the collision. He variously stated that David had achieved his pre-accident status as of an examination conducted in July 2001 (*see* plaintiffs' exhibit 24 at p. 41), that he reached that level as of the October 2001 examination (*see id.* at p. 70) or that his condition still is worse than it was prior to the accident (*see id.* at p. 77). The court accepts Dr. Doolittle's subsequent rejection of the first of these assessments, because he explained that it was based on an expectation formulated at an April 2001 office visit that by the visit scheduled for July, David would have cleared the problems attributable to the accident. At that July visit, Dr. Doolittle actually paid little attention to David's back condition, because that session ended up focusing on problems with insurance coverage and payments. *See id.* at pp. 66, 69.

The remaining question is therefore whether David had achieved his pre-accident baseline in October 2001, as Dr. Doolittle later said, or whether his condition remained aggravated after that time. Under *Lovely*, the defendant bears the burden of segregating the elements of injury and damages. Despite the lack of clarity in this evidence, the court finds, based on an examination of the overall circumstances, that the defendant has failed to prove David had returned to his pre-accident status as of the October 2001 examination. As is noted above, when David's pre-accident and post-accident conditions are compared, the nature of the injury and the nature of the symptoms are not distinguishable. However, the best evidence of the quantitative differences in David's condition between late 2000 and October 2001 consists of the extent of Dr. Doolittle's involvement with David and the nature of the treatment that he was providing to David. Indeed, Dr. Doolittle made this point.[8] From this record, it can be inferred that in late 2000, David was reaching the end of his treatment with Dr. Doolittle for the muscular problems that he first reported in July 2000. By November, David had improved considerably (although, as evidenced by the letter to Blue Cross, not completely). In November, Dr. Doolittle prescribed massage therapy on a monthly or semi-monthly basis, and he encouraged the use of a spa. Then, Dr. Doolittle reported that late into

---

[8] Toward the end of a lengthy exploration of this difficult issue, Dr. Doolittle testified: "I don't get the same quality of back pain complaint or need to treat or urgency to treat with David in November [2000] that I do with David subsequent to the motor vehicle accident." Plaintiffs' exhibit 24 at p. 77.

19

2001, David had pain complaints that were more significant than they had been a year earlier. This evidence has significance because Dr. Doolittle views David as a motivated and cooperative patient, and thus David's reports to Dr. Doolittle carry weight. Dr. Doolittle prescribed massage therapy on at least as frequent as schedule as the 2000 prescription. However, the problem – which in 2000 was expected to be managed by occasional therapy and a hot tub – persisted to the point where in 2002 Dr. Doolittle referred David to Dr. Zolper, a pain specialist. The significance of this intervention, and its apparent difference in magnitude from the treatments invoked prior to the accident, undermine the defendant's claim that the effects of the accident had dissipated by the end of 2001.

The court also gives some weight to Dr. Zolper's opinion, expressed in his November 2002 report, *see* plaintiffs' exhibit 32, that the collision caused his present symptoms. Dr. Doolittle's opinion on causation and the findings he made as he continued to treat David carry greater probative value simply because he had more contact with David at times that are central to this analysis. Nonetheless, as a specialist who specifically addressed the claims at issue here, Dr. Zolper's assessment is entitled to consideration as well.

For these reasons, the court concludes that David's pre-existing back condition and the low back injury he sustained in the collision are one injury and that the defendant has failed to apportion them.

David's back condition now appears to be permanent. As Dr. Doolittle explained, one cannot expect to see progress more than two years after the causative event. Nothing in the record compromises this opinion, and the factual evidence supports it. David has difficult performing certain physical activities, particularly those that involve pulling, lifting or twisting. His life expectancy is 30 years.

David suffered emotional trauma as a result of the accident. This is documented in the records of several of his treaters, including those of Drs. Ross and Doolittle. Ultimately, David was referred to a licensed counselor who provided therapeutic services for him between September 2001 and April 2002. This consisted of eleven sessions. David's counselor formed a diagnosis of an adjustment disorder with a depressed mood (although she did not assign a diagnosis of depression itself). Although the

circumstances arising from the collision provided the impetus for the referral to counseling, David's emotional condition was directly affected by several other significant troubling conditions that are unrelated to the accident. These other matters are discussed in the counselor's transcribed testimony, *see* plaintiffs' exhibit 27, and include issues as momentous as David's complete alienation from his two adult children, their own personal issues, the pendency of court proceedings based on allegations that David's son was allegedly victimized and David's own perceptions of those allegations, and stress associated with the Christmastime holidays. The counselor concluded that the primary stressors underlying her diagnosis were tied directly to the accident: David's injuries created financial pressure on the family, and that pressure led to internal anger and marital and intra-family stress. *See id.* at p. 40. Thus, in the counselor's view, David's inability to work due to his physical injuries was at the root of his emotional stress. However, for the reasons noted below, the plaintiffs have not proven that financial loss. This undermines a central predicate for the counselor's opinion. In connection with this component of David's claim, it is also important to consider that David appears to have made significant progress over the treatment period.

Nonetheless, David's physical injuries and the emotional trauma of an involvement in an accident such as this can only have taken a toll. Thus, the evidence shows that David suffered a single emotional injury resulting from the proven effects of the accident, as well as other circumstances that are not the defendant's responsibility. The court concludes that the collective magnitude of the other unrelated and unproven circumstances far outweigh the source of emotional pressure that is attributable to the accident. In this way, the record supports the defendant's apportionment contention that she should not be held liable for all of the emotional pain and suffering that David experienced.

The court is satisfied that the collision was the precipitating reason that explains why counseling was an appropriate form of treatment for David. Thus, although the defendant is not liable for all of the general emotional damages that David claims here, she is responsible for the expenses of that counseling.

21

For the reasons noted in connection with Nancy's claim, the accident and its repercussions affected the marriage, although, due to the failure of proof of lost wages, not for that reason.

When combined with the other medical special damages that David has proven, his recoverable medical expenses amount to $17,500.

David has made a claim for lost income that he alleges is attributable to the accident. He is self-employed and maintains several lines of work. He works as an excavating and groundwork contractor; he cuts wood and does some plowing in the winter; and during the summer he does yard work. His claim for lost income covers portions of 2001, 2002 and 2003. For 2001, he claims that he was physically unable to work for a period of time immediately following the accident due to his injuries, although he gradually regained the capacity to do so; for 2002, he claims lost wages due to doctor's appointments; and for 2003, he claims lost income because he was unable to work when Dr. Pomeroy performed surgery on his foot.[9] David makes no claim for future lost wages or future work incapacity.

To prove the amount of his lost wages, David uses several alternative approaches. For each of the three years at issue, through his accountant, he presented evidence of his net cash receipts (meaning gross income, less expenses other than depreciation, interest obligations and taxes) for the year and, on that basis, calculated the average amount he earned each week he claims to have worked (that is, excluding the time when he claims he was unable to work due to injuries related to the collision or medical appointments associated with those injuries). He uses his average figure as the amount he claims to have lost each week he did not work. Alternatively, again through his accountant, David

---

[9] At trial, the defendant noted that she was reserving her right to object to anything beyond David's claims for lost income associated with his tree harvesting business and that, if she pressed that objection, she would develop that objection at the then-prospective testimony of David's accountant, which the parties planned to take after the trial. The defendant's concern was based on the extent to which David had disclosed the extent of his lost income claim in discovery. At the outset of that deposition, the defendant again reserved the objections that were discussed at trial. In her written argument, the defendant has not pursued that issue. Thus, the court views this as an issue that the defendant has not pressed and therefore has waived, because it does not appear that in fact she has recorded an actual objection sufficient to trigger a consideration of its merits.

presented evidence of the total number of weeks he was unable to work during the three year period and multiplied that number by the average net cash income he received during the weeks he did work during that duration. These two methodologies resulted in a range of $27,000 to $35,000. Additionally, for 2001, David relies on the amount he, in essence, paid a third party to harvest wood from his (David's) woodlot, then arguing that this is the amount of income he lost because he was unable to perform that work himself. This figure is supplemented by expenses he paid the third party, which David would have assumed had he used his own equipment.

The court finds that each of these approaches is too flawed to support a finding that David has proven by preponderance the amount of any lost income. *Palleschi v. Palleschi*, 1998 ME 3, ¶ 6, 704 A.2d 383, 385 (damages need not be proven to a mathematical certainty); *Down East Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 7, 697 A.2d 417, 420 (preponderance standard). The question underlying David's claim for lost wages is how much income he lost because he was not able to work on certain dates. In some settings, resort to an average income stream is probative of the amount of income lost on a specific occasion. Here, however, at least in part because of the seasonal nature of David's work and the variety of his jobs, his income fluctuates wildly over time. For example, during the first four months of 2002, his total gross income was $50. The next month, he was paid $3,300. In July, his gross receipts exceeded $14,000. Thus, calculations of lost wages based on David's average receipts provide too little information for the court to be able to determine the probable amount of any such damages.

The court also harbors concerns about the quality of the information used by David's accountant to calculate the amount of his net receipts. First, David used his business checking account for personal purposes. Thus, for this reason, the accountant omitted certain deposits in his computation of the business' receipts. Although, as the accountant testified, this commingling is not improper, it clouds the usefulness of information derived from those financial records. Second, the accountant accepted David's account that in 2003, he did not work for twelve weeks as he recuperated from foot surgery. However, David's financial records reveal that during the final four weeks of that twelve week period, he deposited in excess of at least $15,000 into his business'

23

checking account.[10] It is possible that David may have generated this income prior to the surgery in February. However, the record reveals little that is meaningful about the source of the income, and the court declines to speculate about those circumstances. This point is salient, because if David was out of work for fewer than twelve weeks, then the extent for his 2003 lost income claim would be diminished in two ways: his average weekly wage for 2003 would be less because his total annual income would be spread out over more weeks, and the number of weeks he was out of work would be fewer.

In addition to these problems of proof that affect David's lost income claim for all three years, there are additional problems raised by the claim for lost income in 2001. David testified that he lost one full week of work immediately after the accident and that in March, he was forced to engage a third party to harvest trees, haul material and do the other work that David would have done. As lost income, David now claims the difference between what he would have earned had he done that work himself and the amount he paid the third party for those services, plus the expenses David paid to the third party. This amounts to roughly $18,500.[11] However, the record makes clear that David did not contract with the third party for those services until the middle of June 2001 and that this relationship came to an end within a month. The evidence demonstrating this point includes, among other things, two separate documents signed by David stating the date when the third party began the harvesting work in David's stead. *See* plaintiffs' exhibit 28 (Spencer deposition), deposition exhibits 1, 2. One of these documents (deposition exhibit 2) is an official form that must be filed with state offices in Augusta. By June, David was able to perform at least some of his work responsibilities on a schedule amounting to between 70 and 90 hours per week (six or seven days per week, twelve or thirteen hours per day). Thus, any work performed by the third party is work that David could not have done, because David was doing other things. Further, in March, prior to the time when David contracted out some of his work, he was receiving income. As is noted above, this income may have been generated by trees harvested

---

[10] The check register for David's business that David provided to his accountant for this analysis did covered only that part of the relevant period beginning in mid-April.

[11] In fact, prior to trial, David included pre-accident receipts in the income that he alleges he had to share with the third party. At trial, David withdrew that part of his claim.

24

prior to the accident, but that possibility is not made clear on this record. This amounts to a failure of proof on the claim that despite his injuries, David was losing income during that period of time. The problems with this aspect of David's claim are compounded by the additional facts that at least once invoice for harvested trees, dated March 19, 2001, indicates that David was the driver of the truck carrying the felled trees and that he was the cutter. *See* plaintiffs' exhibit 40, R. Leon Williams Lumber Co. invoice 17657. Further, David claims that the third party received half the proceeds from the sale of these trees, demonstrating that the third party was not involved in cutting them.

The record demonstrates that David missed some time from work in each of the three years that forms the basis for this aspect of his claim. However, based on the evidence discussed above, the court is also satisfied that his accounts of the amount of lost time are overstated. Further, the amount of income he did lose cannot be established to a probability. Rather, the state of this claims is best summarized by the David's deposition testimony, admitted into evidence at trial, regarding his 2001 and 2003 lost income claims, that any such amounts simply cannot be determined. Thus, the court denies his claim for lost income.

Based on the evidence discussed herein, the court awards David Astbury compensatory damages in the amount of $75,000.

The entry shall be:

For the foregoing reasons, judgment is entered for each of the plaintiffs against the defendant. Plaintiff Nancy Astbury is awarded damages of $25,000. Plaintiff Sarah Taylor is awarded damages of $7,500. Plaintiff Hannah Taylor is awarded damages of $12,500. Plaintiff David Astbury is awarded damages of $75,000. The plaintiffs are awarded pre-judgment interest, post-judgment interest and their costs of court. Pursuant to 14 M.R.S.A. §§ 1602-B and 1602-C (eff. July 1, 2003), pre-judgment interest on the judgments entered for Nancy Astbury, Sarah Taylor and Hannah Taylor shall be computed at the annual rate of 8%, because those judgments do not exceed $30,000; pre-judgment interest on the judgment entered for David Astbury shall be computed at the annual rate of 3.21% because that judgment exceeds $30,000; and post-judgment interest on each judgment shall be computed at the annual rate of 7.41% .

Dated: January 29, 2004

_____
Justice, Maine Superior Court

25

DAVID ASTBURY - PLAINTIFF
20 COUNTRY WAY
BREWER ME 04412
Attorney for: DAVID ASTBURY
N LAURENCE WILLEY JR
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924


Attorney for: DAVID ASTBURY
MARIE HANSEN
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924


NANCY ASTBURY - PLAINTIFF OBO
20 COUNTRY WAY
BREWER ME 04412
Attorney for: NANCY ASTBURY
N LAURENCE WILLEY JR
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924


Attorney for: NANCY ASTBURY
MARIE HANSEN
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924


SARAH TAYLOR - MINOR PLAINTIFF
Attorney for: SARAH TAYLOR
N LAURENCE WILLEY
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924


Attorney for: SARAH TAYLOR
MARIE HANSEN
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924


HANNAH TAYLOR - MINOR PLAINTIFF
Attorney for: HANNAH TAYLOR
N LAURENCE WILLEY
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-CV-2002-00144


DOCKET RECORD